**HOCHE PRODUCTIONS, S.A., Plaintiff,**

v.

**JAYARK FILMS CORPORATION, Diamond Industries, Inc. and Medallion Pictures Corporation, Defendants.**

**JAYARK FILMS CORPORATION, Third-Party Plaintiff,**

v.

**Nat GASSMANN and K. J. Schrift, Third-Party Defendants.**

**No. 62 Civ. 1754.**

United States District Court
S. D. New York.

May 26, 1966.

Graubard & Moskovitz, New York City, by Irwin Panken and David Pollack, New York City, of counsel, for plaintiff.

Arnold C. Stream, New York City, for defendant Jayark Films.

Garrell & Garrell, New York City, Julius Garrell, New York City, of counsel, for defendant Medallion Pictures Corp.

Harry Merwin, New York City, for third party defendant K. J. Schrift.

BONSAL, District Judge.

This action for breach of contract was tried to the Court on March 22–23, 1966. At the conclusion of the trial the Court dismissed plaintiff's complaint against the defendant Medallion Pictures Corporation and the third party action instituted by the defendant Jayark Films Corporation (Jayark) against third party defendants Nat Gassmann and K. J. Schrift was discontinued by stipulation of the parties without costs. Therefore there remains for decision only the main action of Hoche Productions, S. A. (Hoche) against Jayark and Diamond Industries, Inc. (Diamond).

On October 27, 1958, Hoche entered into a contract with Diamond providing for the distribution of Hoche's film "Monte Carlo Baby". The contract was amended by further agreement between the parties dated November 28, 1958. Under the contract as amended Diamond was to use its best efforts to distribute the film (primarily in the United States). The agreement provided that 50% of the gross revenues derived from the distribution of the film would be paid to Hoche, a French corporation, and the balance of the gross proceeds after deduction of all costs and expenses would be retained by Diamond. Diamond further agreed to furnish Hoche with regular, complete and accurate accounts, with corresponding remittances, quarterly, not later than the 20th day of the month following the termination of each quarterly period. Hoche was given the right to inspect the accounts and the contracts entered into by Diamond, and the agreement provided that all statements rendered by Diamond to Hoche would be deemed accurate unless objected to within one year after they were transmitted to Hoche. Diamond paid Hoche $14,000 as an advance on the amounts which would be due Hoche under the contract. The distribution rights acquired by Diamond under the contract were to run for seven years.

Shortly before the 1958 contract, Diamond acquired the distribution rights to a film "African Manhunt" and, unlike its contract with Hoche, Diamond was to retain all the proceeds of distribution. Diamond distributed the two films to TV stations throughout the United States.

In July of 1959, Jayark purchased all the outstanding stock of Diamond and on July 15, 1959 received from Diamond an assignment of the distribution rights to the two films, which rights were Diamond's sole assets. On April 11, 1961, Diamond filed a Certificate of Dissolution in Delaware, the State of its incorporation.

Upon assignment to it of the two films, Jayark continued their distribution. In connection with the distribution of the two films and other films to which Jayark had distribution rights, Jayark issued on August 17, 1959, a price list to its salesmen in which all the films were rated. Those with the lowest license fee were rated "A", the next "AA", and the highest "AAA". In this price list "African Manhunt" was rated "AA",

while "Monte Carlo Baby" was rated "AAA", indicating that at that time Jayark thought that "Monte Carlo Baby" rated a higher license fee than "African Manhunt".

The gravamen of Hoche's complaint is that Diamond and Jayark breached the 1958 contract by willfully and fraudulently failing to properly account to Hoche for the proceeds derived from the distribution of "Monte Carlo Baby" and by willfully and fraudulently allocating proceeds of the distribution of "Monte Carlo Baby" to "African Manhunt", which in most instances were distributed together as a package. Hoche seeks an accounting to determine the amounts due it by reason of the breach of contract, and punitive damages by reason of the alleged fraud.

Mr. Ploss, a Certified Public Accountant, testified on behalf of Hoche that in February, 1962, and July, 1962, he made an audit of the available books and records of Jayark and of the records of Diamond in the hands of Jayark for the purpose of determining whether Jayark had accounted to Hoche in accordance with the contract. He testified that he was not allowed to see all the records which he thought relevant and that he found numerous errors; evidence of deliberate changes of figures on contracts and on accounts receivable cards; and, in at least one case, evidence that part of a contract had been deliberately altered.[1]

Mr. Bass testified that he was the Comptroller of Jayark from 1955 to 1962 and that he made the allocations of proceeds derived from the distribution of the two films. Mr. Bass said that in making the allocations between the two pictures he merely followed the instructions given to him by Mr. Kaufman, the President of Jayark, or of his wife, who was the Secretary. He recalled that at one time he was given a general instruction to allocate 25% of the proceeds received from the distribution of the two films to "Monte Carlo Baby" and 75% to "African Manhunt".

At the trial there were introduced some 103 distribution contracts entered into by Diamond and Jayark with various TV stations. In most cases there are attached to the contracts Diamond's or Jayark's accounts receivable cards showing the proceeds received under the contract and the allocation of the proceeds between the two films.

A careful examination of these contracts shows that in 93 of the contracts "Monte Carlo Baby" was block-booked with "African Manhunt". In one instance (WWL), however, "African Manhunt" is allotted $250.00 on the accounts receivable card and "Monte Carlo Baby" only $150.00 where "African Manhunt" was not booked under the contract.

In 42 of the 93 contracts in which "Monte Carlo Baby" and "African Manhunt" were blocked-booked, a specific license fee for each of the films appears on the face of the contract or in the purchase order attached thereto. On 4 of these contracts the specific license fee is written in, and in 2 of the contracts the license fee is changed. In the absence of initials or other indication that the licensees consented to these changes, it is likely that they were made by the defendant after the contracts were entered into. In each case these changes favor "African Manhunt" by ratios of 1 : 3 or better.

In another instance Jayark entered into a contract on October 27, 1959, with WCBS for the distribution of 19 films for a total fee of $285,000.00. The license fee per film was set forth in the schedule attached to the contract and provided a license fee for "Monte Carlo Baby" of $10,500.00 and a license fee for

[1]. In his report to Hoche on April 26, 1962, Ploss stated that he had examined 101 contracts and that in his opinion the allocations to "Monte Carlo Baby" in 99 of them were unfair. Operating on the assumption that the proceeds of distribution should have been divided equally, Ploss computed that there was a minimum due plaintiff Hoche of $16,845.35, or $16,077.28 more than Jayark had reported in its accountings.

"African Manhunt" of $11,000.00. When Mr. Ploss sought to examine Jayark's records with respect to this contract he found that part of the schedule setting forth the license fees per picture had been cut off and that the accounts receivable card showed an allocation of $6,600.00 to "Monte Carlo Baby" and $14,900.00 to "African Manhunt". This fraud on Hoche was proven at trial when the plaintiff called a representative of WCBS who produced the original contract between it and Jayark, showing the license fees per film.

In 25 of the 42 instances where specific license fees are indicated, the fees for each of the two films are equal or nearly so. Despite this fact, the accounts receivable cards show that in 8 of these instances, a higher allocation was made to "African Manhunt" than to "Monte Carlo Baby". For example, in the KFSD contract $350.00 was stated as the license fee for each film, but on the accounts receivable card "African Manhunt" was allocated $600.00 and "Monte Carlo Baby" only $100.00. In the WJW contract the license fee is $800.00 for each film, but on the accounts receivable card, $1,350.00 is allocated to "African Manhunt" and only $250.00 to "Monte Carlo Baby".

In 12 contracts out of the 42 contracts where specific license fees are provided, a higher license fee was provided for "African Manhunt". All these contracts were negotiated by Diamond prior to the transfer to Jayark.

In one Medallion contract (WHDH) the license fee for "Monte Carlo Baby" was stated as $1,600.00 and for "African Manhunt" as $1,000.00. On the Diamond accounts receivable card however, "Monte Carlo Baby" was allocated $300.00 and "African Manhunt" $2,300.00.

In 51 contracts where there is no license fee specified for "Monte Carlo Baby" and "African Manhunt" in the contract, 22 of the accounts receivable cards allocate the proceeds on a ratio of 1 : 3 favoring "African Manhunt" (the ratio which Mr. Bass testified was given to him as a general instruction). This ratio, however, was not followed with any consistency. In 3 instances the cards show equal allocations and on the 26 other accounts receivable cards the allocations range from ratios of 1 : 2 to 1 : 15.[2] In no instance is more allocated to "Monte Carlo Baby" than to "African Manhunt".

In examining the accounts receivable cards the Court noted at least 19 erasures and there were also erasures on the contracts themselves. Some of these erasures may be due to human error. However in 10 instances the changes by reason of erasure favor "African Manhunt" and in no instance does an erasure result in a more favorable allocation for "Monte Carlo Baby".

This review of the contracts and the accounts receivable cards establishes that the records of Diamond and Jayark were deliberately tampered with, being replete with erasures, changes, inconsistencies and other evidences of fraud. It takes no imagination to discover the reason for the tampering. The evidence shows that throughout the distribution period Jayark preferred "African Manhunt" over "Monte Carlo Baby", since it would retain all the proceeds with respect to "African Manhunt", while it was accountable to Hoche as to 50% of the gross proceeds derived from the distribution of "Monte Carlo Baby". The record makes it abundantly clear that the allocations completely disregarded any question of the merits of the two films, as well as Jayark's obligations under the contract.

Jayark contends that plaintiff is barred from seeking an accounting with respect to contracts included in Diamond's statement of accounts dated May

2. The proceeds of the KHOV contract were allocated on a ratio of 1 : 15. Although license fees for "African Manhunt" of $3,000 and for "Monte Carlo Baby" of $200 appear on the face of the contract, these figures appear over erasures and are not initialed by the licensee. Many accounts receivable cards show allocations on ratios of 1 : 10 and 1 : 11.

25, 1959. Jayark relies on the provision in the 1958 contract to the effect that the failure of Hoche to notify Diamond of objections to any account within one year would establish a conclusive presumption as to the accuracy of the account. Jayark asserts that Hoche did not object to any of the accounts rendered by Diamond or Jayark until May 4, 1962, one week before the complaint in this action was filed.

The record shows, however, that on May 8, 1959, Hoche, by its attorneys Graubard and Moskovitz, addressed a letter to Diamond, in care of its attorneys, calling Diamond's attention to its failure to render any accounting under the contract. This produced the first accounting and on May 25, 1959, Hoche requested Diamond, through their respective attorneys, to furnish periodic statements in the future in accordance with the contract. On June 3, 1959, Hoche again wrote Diamond through their respective attorneys to the effect that the first accounting, covering the period to April 30, 1959, had been forwarded to Hoche and that Hoche requested further details, including a breakdown of the distribution contracts and the collections attributable to each contract. No reply was received and Hoche again wrote Diamond, through their respective attorneys, on January 12, 1960, to the effect that no breakdown of the first report had been received, nor any subsequent accounts made, as required by the contract. On January 14, 1960, Diamond's attorneys replied that they were under the impression that Hoche had received all the information which it desired but that they were requesting Diamond to give the matter their immediate attention. On March 7, 1961, plaintiff's attorneys again wrote Diamond, by its attorneys, and the letter was returned by the attorneys with the notation: "We do not represent 'Diamond Industries'". On March 21, 1961, plaintiff's attorneys wrote Diamond's attorneys reminding them of a telephone conversation pursuant to which the latter had

agreed to obtain for Hoche a full accounting with respect to the distribution of "Monte Carlo Baby" in accordance with the contract. The request was followed up on December 27, 1961, again with no response from Diamond.

On January 18, 1962, Jayark sent to Hoche's lawyer a "detailed report" with respect to the motion picture feature entitled "Monte Carlo Baby" for the period from its inception to December 31, 1961, together with a check in the amount of $768.07, to cover the amount payable thereunder to Hoche. In this letter Mr. Kaufman, President of Jayark, stated: "We greatly regret the difficulties related to this matter and assure that reports henceforth will be made as required under the terms of the contract." By letter dated May 4, 1962, Hoche rejected a check for $89.62 which accompanied Jayark's purported statement of account of March 31, 1962, again requesting a full accounting and requesting Jayark to cease and desist from making any further distribution of "Monte Carlo Baby" until such account had been rendered.

On this record it is amply demonstrated that Hoche was seeking proper accountings over a long period of time, and objections to such accounts as were rendered were timely raised. Moreover, by its letter of January 18, 1962, Jayark admits that it breached the contract with respect to the furnishing of accurate statements before that date.

■ Jayark further contends that it may not be held liable for the distribution activities of Diamond before the assignment of the distribution agreement on July 15, 1959. However, in two pretrial affidavits dated October 5, 1962 and June 28, 1963, Robert J. Ward, a member of the firm then representing Jayark, stated that Jayark had assumed Diamond's liabilities. A similar statement was made by Bass in an affidavit sworn to June 13, 1962. As noted above, Jayark had purchased all of the outstanding stock of Diamond and then took by assignment its only assets. On these facts the Court could find either that

Jayark impliedly assumed Diamond's obligations or that the transactions between the two corporations amounted to a merger. See, Fletcher, Cyclopedia of Corporations, Vol. 15, Ch. 61, § 7122 (1961 Revised Vol.) and cases cited therein.

■ If Diamond had been merged into Jayark after Jayark had acquired all of its stock and assets, Jayark would clearly be liable for Diamond's breaches of contract. The New York Business Corporation Law, McKinney's Consol. Laws, c. 4, § 906, provides that:

"(3) The surviving or consolidated corporation shall assume and be liable for the liabilities, obligations and penalties of each of the constituent corporations. No liability or obligation due or to become due, claim or demand for any cause existing against any such corporation, or any shareholder, officer or director thereof, shall be released or impaired by such merger or consolidation."

The Court will not permit Jayark to escape liability for Diamond transactions where a merger did occur *de facto*, if not *de jure*, and holds that Jayark is liable with respect to the distribution activities of Diamond.

■ Accordingly, Hoche is entitled to an accounting with respect to the distribution of "Monte Carlo Baby" from Jayark covering the full period of the 1958 contract and damages by reason of the breach of contract. Since Jayark not only breached the contract, but has been guilty of fraud, Hoche is entitled in addition to punitive damages against Jayark in an amount equal to the payments it should have received under the 1958 contract from the date it was assigned by Diamond to Jayark. Walker v. Sheldon, 10 N.Y.2d 401, 223 N.Y.S.2d 488, 179 N.E.2d 497 (1961).

The foregoing opinion constitutes the Court's findings of fact and conclusions of law (Rule 52(a) F.R.Civ.P.).

For the purposes of the accounting, the two films will be deemed to be of equal value, except where a distribution

contract specified a license fee for "Monte Carlo Baby" which shall be used. However where there has been a change, erasure or insertion with respect to the license fee on a contract, it shall not be used unless the approval of the licensee to such alteration shall clearly appear.

An interlocutory judgment will be entered by the Court in favor of the plaintiff Hoche against Jayark, and thereafter the Court will designate a Special Master to compute the damages, including punitive damages, to which the plaintiff is entitled in accordance with this opinion.

Settle judgment on notice.